UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

SCOTT REEL,                          )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             )     Case No. 1:09CV120 CDP
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
          Defendant.                 )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Scott Reel's applications for benefits under the Social Security Act. The first

application is for disability insurance benefits (DIB) under Title II of the Act, 42

U.S.C. §§ 401, et seq. The second application is for supplemental security income

(SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381,

et seq. Section 205(g) of the Act, 42 U.S.C. §§ 405(g), provides for judicial

review of a final decision of the Commissioner under Title II, and Section

1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a

final decision under Title XVI. Reel claims he is disabled due to a psychotic

disorder, a bipolar disorder, a liver disorder, and epilepsy. The relevant time

period for consideration of Reel's DIB claim is from July 1, 2002, the alleged

onset date, through September 30, 2006, the date his insured status expired.[1] The

relevant time period for his SSI claim is from April 29, 2005, through the date of

the ALJ's decision. Because I find that the decision denying benefits was

supported by substantial evidence, I will affirm the decision of the Commissioner.

## Procedural History

Reel filed his applications for disability benefits on April 29, 2005. Reel's

applications were denied initially.[2] On September 12, 2007, following a hearing,

the ALJ issued a decision that Reel was not disabled. The ALJ found that Reel's

alcohol abuse was a material factor in his disability. The Appeals Council of the

Social Security Administration (SSA) denied his request for review on July 8,

2009. Therefore, the decision of the ALJ stands as the final decision of the

Commissioner.

---

[1]To meet the requirements for insured status, an individual is required to have 20 quarters of coverage in a 40-quarter period ending with the first quarter of disability. See 42 U.S.C. §§ 416(i)(3)(B) and 423(c)(1)(B); 20 C.F.R. § 404.130. To be entitled to benefits under Title II, Reel must establish that he was disabled prior to the date his insured status expired, which is September 30, 2006.

[2]Missouri is one of several test states participating in modifications of the disability determination procedures applicable to this case. See 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2001). These modifications include the elimination of the reconsideration step and, in some cases, the Appeals Council review step in the administrative appeals process. See id.

## Evidence Before the Administrative Law Judge

### Medical Records

In March 2002, Reel was hospitalized due to hepatic failure, thrombocytopenia, an infected tooth, and hypokalemia. Reel reported having a sore tooth for the previous two weeks for which he took aspirin. Tests revealed an abnormal liver function and the enzymes suggested a combination of an alcohol injury or ischemic changes with a therapeutic aspirin level. Reel appeared alert, oriented, in no acute distress, and neurologically intact. Reel received treatment with significant improvement and was advised not to take aspirin, use alcohol, or smoke. Peter Mackercher, M.D., indicated that a liver transplant would be "considered." Dr. Mackercher released Reel to return to work on April 9, 2002, but told him that he might be exhausted for awhile.

Reel returned to Dr. Mackercher on January 7, 2003, for complaints of a rash. It was noted that Reel continues to smoke and drink, including a "couple of beers" that day. On February 23, 2003, Dr. Mackercher saw Reel for alcohol intoxication. He had abdominal pain and vomited blood. Reel's blood alcohol content level was above a potentially lethal level. Dr. Mackercher advised Reel to avoid pain medication and alcohol because of his liver damage.

On June 5, 2003, John Black, M.D., treated Reel for being drunk. Reel

admitted that he was still smoking and drinking, and tests again revealed a high blood alcohol content level. Two days later, Reel was taken to Dr. Phillip Bufford because he had a seizure while in jail. Reel was assessed with an alcohol withdrawal seizure, and he was admitted by Dr. Mackercher for "acute detoxification" later that day. At that time, Reel appeared tremulous with a tonic clonic seizure. Dr. Mackercher diagnosed alcoholism with alcohol withdrawal seizures. Reel left the detoxification against medical advice.

On June 22, 2003, Mark Williams, M.D., saw Reel following a seizure. He diagnosed Reel with alcohol withdrawal and ordered Reel hospitalized after Reel experienced delirium tremens. Lance Lincoln, M.D., started Reel on alcohol withdrawal protocol after diagnosing Reel with alcohol withdrawal. Although Reel was responding well to the treatment, he again decided to leave the treatment early against medical advice.

In July of 2003, Charles Smith, M.D., treated Reel for "passing out." Dr. Smith assessed alcohol abuse and noncompliance. Reel was told not to drive and was prescribed Dilantin. Smith presented to Jamie Pritchard, M.D., on November 22, 2003, stating that he had a history of "stress seizures." Dr. Pritchard noted that Reel smelled of alcohol. Reel appeared neurologically intact and admitted to being out of Dilantin for some time.

Reel did not seek medical treatment again until August 4, 2004. Reel saw Dr. Bufford again after he had a seizure in jail. Reel had stopped taking his Dilantin two weeks prior to his seizure and was advised not to drive for six months. On November 18, 2004, Reel underwent a psychological screening in jail. During the screening, Reel assaulted a guard. Reel exhibited an anxious mood, an inappropriate affect, agitated behavior, and impaired judgment and insight. Reel had no history of any mental health treatment. Donald Vinke, R.N., assessed Reel as acutely psychotic, delusional, and "possible detox." Mr. Vinke assigned a Global Assessment of Functioning (GAF) score of 45.[3] On the same day, Reel was admitted to St. Vincent Health System with an exacerbation of psychosis with auditory hallucinations and paranoia, and appeared very irritable and agitated. He exhibited moderate psychomotor retardation, and tests showed that his Dilantin level was subtherapeutic. While there, Reel also had a sonogram of his liver, which revealed a moderate fatty infiltration of the liver. After six days of treatment, Reel was discharged.

On January 17, 2005, Reel was referred to Steve Gaut, M.D., for evaluation.

---

[3]A GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. revision 2000)(DSM-IV-TR). A GAF of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning.

Reel stated that he was having panic attacks, and that he could not concentrate or sleep. Reel told Dr. Gaut that he had not had a drink for 54 days. He appeared well groomed, with average demeanor, eye contact, psychomotor activity, and speech. Gaut noted that Reel demonstrated logical thought process, full affect, and cooperative behavior. Gaut assigned Reel a GAF score of 48.

R. Stephen Austin, M.D., examined Reel on March 18, 2005. Reel told Dr. Austin that his seizures prevented him from doing his past work setting up mobile homes. Reel complained of anxiety but admitted that he did not take his medications as prescribed. Dr. Austin noted that Reel's attention span remained adequate to read, and Reel appeared alert, oriented, in no acute distress, pleasant, cooperative, and polite, with appropriate behavior and normal psychomotor activity. Reel's memory was normal. Dr. Austin assigned Reel a GAF score of 48 and diagnosed him with psychotic disorder, major depressive disorder, panic disorder, and seizure disorder. Austin prescribed Klonopin and Risperdal and noted that Reel should return in two months, or sooner if needed. On April 7, 2005, Reel reported that was already out of his medications so he was prescribed more. Dr. Austin renewed Reel's prescription for a generic brand of Dilantin on April 29, 2005.

In August of 2005, Reel, with the assistance of friends and family members,

completed Social Security Agency forms in connection with his applications for benefits. Reel's wife stated that Reel had six seizures over a two to three year period, and his cousin indicated that Reel had 3 seizures over a 24-month period.

On August 23, 2005, Robert Hudson, Ph.D., a consultative examiner, examined Reel in connection with his applications for benefits. Dr. Hudson reported that Reel appeared cleanly dressed, pleasant, and totally relaxed. Reel walked to the examination by himself. Reel had just been released from jail and reported no behaviors similar to those from November of 2004 since that time, but Reel expressed fear that it could happen again "at random." Dr. Hudson believed that Reel's medication should effectively control any thought disorder symptoms that he experienced, "which presumably he never had much anyway." Reel spoke in either "vague or overly direct terms" and demonstrated a somewhat blunt affect with "unknown mood." Reel's concentration, persistence, and pace were found to be "within normal limits" (WNL).

On August 30, 2005, Stephen Waley, M.D., one of the defendant's medical consultants, reviewed Reel's medical records and concluded that Reel did not suffer from a severe physical impairment, including seizures.

On August 31, 2005, Jay Rankin, another medical consultant for defendant, completed a form called the Psychiatric Review Technique form, to assess Reel's

residual functional capacity (RFC) in connection with Reel's application for benefits. Rankin did not examine Reel. Rankin found that Reel suffered from schizophrenic, paranoid, and other psychotic disorders, affective disorder, anxiety-related disorder, and personality disorder. Rankin found Reel had mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence, and pace. Rankin found that Reel suffered from moderate difficulties in maintaining social functioning and had no episodes of decompensation. In the Mental RFC assessment, Rankin noted that Reel was only moderately limited in the following areas: the ability to work in coordination with or proximity to others without distraction; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a persistent pace and without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to set realistic goals or make plans independently of others. In all other categories, Reel was rated as not significantly limited. Rankin concluded that Reel was "able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of task is learned and performed by rote, few variables, little judgment; supervision required is simple direct and

concrete."

Reel went to Dr. Austin on September 26, 2005. He stated that he was not on any medication because he "could not really afford" it. Reel told Dr. Austin that he took Xanax to sleep and had "a lot of bad days" and panic attacks. Dr. Austin noted that Reel's affect and mood were anxious, but Reel appeared alert and oriented and denied having hallucinations. Dr. Austin's diagnosis remained the same except he added "problems with social environment/ occupational/ economic/ access to health care/ legal/ other psychosocial and environmental problems." Dr. Austin assigned Reel a GAF score of 50 and prescribed him Xanax. He also noted that he should consider putting Reel back on Risperdal for his psychotic disorder.

Reel's medical files were reviewed by two SSA medical consultants in connection with his applications for benefits. On December 19, 2005, Alice Davidson, M.D., completed the SSA forms for disability determination. She noted that Reel's impairments were liver disease and alcohol abuse and concluded that his physical impairments "would be rated not severe." On December 28, 2005, Dan Donahue, Ph.D., stated that he reviewed all the evidence in the file and affirmed Rankin's assessment of August 31, 2005.

On December 30, 2005, Reel saw Lauri Patterson, a registered nurse in Dr.

Austin's office, for medication management. Reel told her that he was taking his prescribed Lexapro and Alprazolam, but he could not afford to pick up his Risperdal medication. He also reported six seizures a month, at least one of which was a grand mal seizure. Reel told Patterson that he continued to see things that "are not part of reality," but denied auditory hallucinations. He reported an increase in stress levels and erratic appetite. Patterson described Reel's mood as euthymic and noted that he was alert and oriented with fair eye contact. When told that he needed to see his therapist to comply with his treatment plan, Reel claimed that she had been unavailable.

Reel saw Dr. Austin again on March 3, 2006. Reel reported feeling anxious and stated that he needed to take more than the prescribed amount of medication to control his anxiety. Reel mentioned that he got angry at his wife, so Dr. Austin increased his dosage of Risperdal to control the anger and anxiety. Austin's diagnosis remained the same as before, except that he added "rule out antisocial personality disorder." He assigned Reel a GAF score of 50 and noted that he should continue to see Dr. Gaut.

On July 7, 2006, Reel went to emergency services at Baxter Regional Medical Center and was admitted because of a seizure, alcohol withdrawal, and delirium tremens. Reel was successfully treated with Valium, along with a Haldol

and Allopurinal infusion for "vegetation and psychosis." A liver test confirmed alcohol abuse. While in the hospital, Reel was evaluated by a physical therapist and was found to be ambulatory and able to perform all functions of daily living. After a six day stay, Reel was discharged and advised that if he continued his behavior that his likelihood of survival over the next 5 years was less than five percent. Reel and his wife testified that this was the "turning point" in Reel's life, and that he stopped drinking shortly after he was released from the hospital.

Dr. Gaut discharged Reel from his care on August 18, 2006, after Reel frequently missed or cancelled appointments. Dr. Gaut noted that Reel wanted medication or therapy only when he was in crisis but then failed to follow through with his treatment.

Testimony

At the time of the hearing on April 19, 2007, Reel was 49 years old. He graduated from high school and attended some classes at a community college. Reel primarily worked setting up mobile homes, but he also held jobs as a substitute teacher, a warehouse supervisor, and a farming foreman. Reel and his wife Tonya were currently living in the home of a friend. Reel testified that he moved back to Missouri to be close to family "because of the doctor's reports that says I do not have much longer left on this mortal plane."

Reel testified that he has seizures two to three times a month and takes Dilantin for seizures. Reel said that he is afraid to leave his house because of the seizures, and that his wife had to quit her job to take care of him. Reel stated that he has a constant pain in his liver and does not sleep well at night. Reel testified that he has panic attacks and has been prescribed anti-depressant and anti-anxiety medications, but he cannot afford them. Reel told the ALJ that he stopped drinking "well over a year ago," which he first believed was around Christmas in 2005, then claimed that he stopped after his hospital stay in July of 2006.

Reel's wife Tonya also testified at the hearing and told the ALJ that Reel either stopped drinking in July of 2006 or about seven or eight months before the hearing. She first testified that he stopped drinking when he got out of the hospital in July of 2006, but then said after he got out he drank "very little" and "would take a drink or two" but then quit when they moved to Missouri shortly thereafter. She admitted that in the past Reel had been drinking one and one-half pints of alcohol daily, while some days he consumed a half-gallon of alcohol daily. She said that Reel's liver damage caused him stomach pain and that he had seizures for the past four years. She believed that Reel's seizures increased in intensity and estimated that he had two to three petit mal seizures per week and about one grand mal seizure per week while on Dilantin. She testified that his

anxiety attacks are not that bad while he is taking his medication, unless he is around big crowds.  Tonya also stated that Reel had psychotic episodes weekly, where he "just flips out," and that he had a slight stroke in January of 2006.  Tonya also testified that they were unable to afford Reel's Lexapro, Risperdal, Phenobarbitol, and Xanax, but that he was taking his Dilantin.  Tonya stated that Reel lacks focus and concentration, and that he has scabs on his arms and ribs and intestinal tract bleeding.  She told the ALJ that they were trying to arrange mental health counseling for Reel but could not afford it.

David O'Neal, a vocational expert, testified at the hearing.  The ALJ  asked the expert to assume a hypothetical person who could perform light work with no driving, no working at unprotected heights, no work around dangerous equipment, no climbing of scaffolds, ladders or ropes.  The individual was limited to non-complex, simple instructions, with routine, repetitive work that involved little judgment and could be learned by rote with few variables.  Lastly, the individual could have superficial contact incidental to work with the public and co-workers, and needed concrete, direct, and specific supervision.  With those assumptions, the vocational expert testified that such an individual could perform work as a poultry cutter and a hotel/motel maid.

**<u>Evidence Submitted to the Appeals Council</u>[4]**

The following additional evidence was presented to the Appeals Council.

Reel did not seek any additional medical care until March 20, 2008. At that time,

he was in jail in Arkansas "on offenses related to his DWI [driving while

intoxicated]" charge. (Pl.'s Brief at 12). Reel was evaluated by Tammy Berke,

Ph.D. Dr. Berke noted that Reel was well-groomed with average demeanor,

psychomotor activity, and speech, with logical thought processes and full affect.

He reported feeling depressed, anxious, and angry. At that time, Reel told her that

he had not had any alcohol for one and one-half years. She assigned an Axis I

diagnosis of PTSD, major depression recurrent by history; panic disorder with

agoraphobia by history; and, psychotic disorder NOS by history. For Reel's Axis

III diagnosis, Burke wrote "seizures; sores and scars on arms due to Tylenol OD

(overdose) 4 years ago; needs liver transplant." She assigned Reel a GAF score of

40-45. She recommended outpatient therapy, psychiatric evaluation and

medications, and counseling for PTSD.

About one month later, while still in jail Reel was evaluated by Joel Price,

---

[4]Although this evidence was not submitted to the ALJ, "where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." <u>Davidson v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007).

M.D. Reel told him that he really just wanted his prescriptions for Lexapro, Risperdal, and Xanax refilled, which he had been obtaining "from his neighbor" and "off the street" since 2006. Reel indicated that he did not intend to return to the clinic, since he was going to move back to Missouri after he got out of jail. Dr. Price noted that Reel was alert and oriented, dysthymic, and not psychotic. Dr. Price wrote Reel a three-month prescription for Lexapro, Risperdal, and Xanax.

Back in Missouri, Reel was taken to Twin Rivers Regional Medical Center on March 20, 2009, reporting that he tripped and hit his head. Reel sustained moderate soft tissue swelling and a left lateral scalp hematoma. The clinical impression was listed as a fall, chronic seizures, contusion to the head, and thrombocytopenia. On admission Reel admitted to drinking socially, but a blood alcohol level test was performed and came back normal. His affect was normal, and there was no evidence of delusional thinking, psychosis, homicidal or suicidal thought processes or behavior. Reel checked out of the hospital against medical advice.

Reel's parents wrote letters in support of his benefits applications in April of 2009. Reel's mother described the March 20, 2009 incident as follows:

> On March 20, 2009, Scott walked to a nearby convenience store. At about 6:00 p.m., we received a phone call from Sarah Haywood, an employee of that store, called The Junction. She said Scott had had a

seizure or some sort of fainting spell, and was unconscious on the floor. We went up there immediately. They had called 911, and an ambulance and two paramedics were there. He was strapped down to a stretcher, but conscious and very restless. He knew his name and social security number, but little else. He was so agitated and confused he didn't know where he was or how he had gotten there. He had no memory of how he got to Holcomb. He did not recognize his dad and then myself as his parents. He kept trying to unstrap and finally got still after we told him to do so. He was taken to Twin Rivers Hospital in Kennett, MO . . . .

His mother describes Reel as follows:

Scott is very nervous, and sometimes becomes irrational, delusional, and hard to deal with. At other times, he is soft-spoken and well-mannered and congenial. He tells wild tales about things that have happened in the last few hours, but there is no proof that the events did not take place. He does not seem to be able to take care of himself. He shares meals with us, but must be reminded to bathe. He reeks of body odor and other aromas I cannot identify. I have been doing his laundry . . . He has gotten angry and cursed and yelled at both his dad and myself. We cannot handle him sometimes and our health and resources do not allow for us to be responsible for him. We do not know what to do.

Reel's dad wrote in his letter that Reel "drinks, [] becomes belligerent and argumentative, invents crazy stories, and when faced with the reality of those stories, becomes agitated and storms out of the house."

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell

v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment

which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See

e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the

subjective complaints, the ALJ is required to consider the factors set out by

Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters
> as: (1) the objective medical evidence; (2) the subjective
> evidence of the duration, frequency, and intensity of plaintiff's
> pain; (3) any precipitating or aggravating factors; (4) the
> claimant's daily activities; (5) the dosage, effectiveness and
> side effects of any medication; and (6) the claimant's functional
> restrictions.

Id. at 1322.  When an ALJ explicitly finds that the claimant's testimony is not

credible and gives good reasons for the findings, the court will usually defer to the

ALJ's finding.  Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007).

According to the Act, "[a]n individual shall not be considered to be disabled

for purposes of this subchapter if alcoholism or drug addiction would (but for this

subparagraph) be a contributing factor material to the Commissioner's

determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C),

1382c(J).  Drug addiction or alcoholism is "material" if the individual would not

still be found disabled if alcohol or drug use were to cease.  20 C.F.R. § 404.1535.

The Commissioner does not have the burden of proving that substance abuse is

material.  Rather, an applicant seeking disability insurance and supplemental

security income benefits carries the burden of proving that substance abuse was not a contributing factor material to the claimed disability. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Vester v. Barnhart, 416 F.3d 886, 888 (8th Cir. 2005). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

The Eighth Circuit Court of Appeals clarified the analytical process that the ALJ must follow in Brueggemann v. Barnhart, 348 F.3d 689, 693-695 (8th Cir. 2003) (citing 20 C.F.R. §§ 404.1535, 416.935). The ALJ must first evaluate a claimant's substance abuse using the procedures set forth in the regulations. Id. The ALJ must evaluate the claimant's residual functional capacity ("RFC") when considering the use of alcohol. Id. Then, if the claimant is found disabled, the ALJ must evaluate what limitations would remain when the effects of substance abuse disorders were absent. Id.

### The ALJ's Findings

The ALJ issued her decision that Reel was not disabled on September 12, 2007. In reaching her decision, the ALJ followed the five-step sequential evaluation process, noting at step one that Reel had not engaged in substantial gainful activity since July 1, 2002. Proceeding to step two, the ALJ found that

Reel had severe impairments of alcohol abuse, history of DTs and seizures, history of hepatitis, chronic obstructive pulmonary disease, major depression, panic attacks, and personality disorder.

At step three, the ALJ concluded that Reel's condition did not meet or exceed one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted that Reel did not have marked restrictions in activities of daily living or concentration, persistence or pace. She concluded that Reel had marked difficulties in social functioning, but no episodes of decompensation.

The ALJ concluded that, including his substance abuse disorder, Reel had the residual functional capacity to perform light work, without driving, climbing or working at unprotected heights or with dangerous machinery. She concluded that Reel was limited to simple, non-complex instructions, using little judgment, with routine and repetitive work, learned by rote with few variables, and only superficial contact with the public and co-workers. She also found that if he continued to drink Reel would miss work, unscheduled, two or more times per month because of the effects of his alcohol abuse, and could not return to his past relevant work. Based on the vocational expert's testimony, the ALJ concluded that considering all of Reel's impairments, including his substance use disorder, Reel would be unable to make a successful vocational adjustment to work that

exists in significant numbers in the economy, and that a finding of disabled was appropriate.

Because there is evidence of substance abuse disorder in this case, the ALJ was also required to determine whether Reel's substance abuse disorder was a contributing factor material to the determination of disability under section 423 (d)(2)(C) of the Social Security Act.  If so, he is not disabled.  When considering this additional issue, the ALJ concluded that if Reel stopped the substance abuse, he would continue to have a severe impairment or combination of impairments, which she identified as chronic obstructive pulmonary disease, a personality disorder, some depression and panic attacks, and a history of seizure activity. However, she concluded that Reel would not have an impairment or combination of impairments that would meet or medically equal any of the listed  impairments if he stopped his substance abuse.  She found that he would have only mild restrictions in the activities of daily living if he stopped drinking.

The ALJ found that if Reel stopped drinking, he would have the residual functional capacity to perform light work, except because of his seizures, he could not drive, climb scaffolding, ladders or ropes, and could not work at unprotected heights or around dangerous equipment.  She also concluded that he would still be limited to simple, non-complex instructions, in a routine and repetitive job that

used little judgment and is learned by rote with few variables. The ALJ also decided that Reel could have only superficial contact with the public and co-workers and would need concrete, direct, and specific supervision. In making these findings, the ALJ evaluated Reel's subjective complaints using the standard set out in Polaski v. Heckler, 751 F.2d 943 (8th Cir. 1984). After considering the medical evidence, Reel's testimony and his appearance and demeanor at the hearing, and the Polaski factors, the ALJ found that Reel could perform light exertional work.

The ALJ held that Reel would still experience some symptoms if he stopped drinking, but that Reel's statements about the intensity, persistence, and limiting effects of these symptoms were not entirely credible. Moreover, the ALJ took into consideration that Reel did not follow the treatment plan prescribed by his doctor and discounted his assertions that he was unable to afford his medications when the testimony demonstrated that he and his wife spent a considerable amount of money on alcohol and cigarettes. In addition to not taking his prescribed medications, the ALJ noted that Reel resisted going to Alcoholics Anonymous, left the hospital against medical advice, and continues to smoke. The ALJ believed that Reel could have a productive life, with substantial gainful activity, if he took his medication and attended counseling on a regular basis. The ALJ

concluded that Reel's problems "are primarily related to his history of alcohol abuse," and that, even if he stopped drinking, he would still be expected to have some problems with seizures for several years. She also believed his fatigue level and depression would improve from stopping alcohol abuse.

Based on the vocational expert's testimony, the ALJ concluded that if Reel stopped his substance abuse, and considering his age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that he could perform, including jobs as a poultry cutter/trimmer and hotel/motel maid. For these reasons, the ALJ decided that, if Reel stopped his substance abuse, he would not be disabled. Because the ALJ determined that Reel would not be disabled if he stopped drinking, his substance abuse disorder was a contributing factor material to the determination of disability. Therefore, Reel was found to be not disabled.

## Discussion

Reel argues that the ALJ erred by finding that his alcohol abuse was a contributing factor material to the determination of disability. Reel contends that the ALJ failed to properly consider the evidence that his symptoms continued after he stopped drinking in July of 2006, and that she should have consulted a medical expert in reaching this decision. Here, the ALJ properly followed the steps

outlined by the Eighth Circuit in <u>Brueggemann</u>, 348 F.3d at 693-695.  First, she

determined that Reel was disabled when considering all the evidence, including

his alcohol abuse.  Then, she considered Reel's limitations absent alcohol abuse.

Although the ALJ found that Reel would continue to have a severe impairment or

combination of impairments,  she concluded that he would not have an impairment

or combination of impairments that would meet or medically equal any of the

listed  impairments if he stopped his substance abuse.  She found that he would

have only mild restrictions in the activities of daily living and social functioning if

he stopped drinking, and moderate limitations in concentration, persistence, and

pace.

The ALJ's determination is supported by the medical records, which

demonstrate that Reel behaved appropriately when sober, and that his

concentration, persistence and pace were normal with logical thought processes

and full affect.  The ALJ acknowledged that Reel would continue to have some

symptoms from alcohol abuse if he stopped drinking, but that these symptoms

would not preclude him from substantial gainful activity.   In reaching this

conclusion, the ALJ considered the testimony of Reel and his wife about the

frequency and duration of Reel's seizures, as well as the medical records that Reel

had "sub-therapeutic levels of Dilantin" and was considered to be non-compliant

with his treatment by his treating physician.  After Reel claims he stopped

drinking in July of 2006, he was also discharged from Dr. Gaut's care for

frequently missing or cancelling appointments.  Reel received no additional

medical treatment until March of 2008, when he sought medication refills while

incarcerated.   The lack of treatment records supports the ALJ's decision that

Reel's problems were not disabling absent the effects of alcohol.   The ALJ found

Reel's claim that he stopped drinking in July of 2006 credible to the extent it was

supported by the medical record.  However, the evidence submitted to the Appeals

Council demonstrates that Reel continued to drink even after that time.  In March

of 2009, Reel admitted that he drank socially when he was admitted to the Twin

Rivers Regional Medical Center for tripping and hitting his head, and Reel's father

wrote the Appeals Council in April of that year that Reel "drinks, [] becomes

belligerent and argumentative, invents crazy stories, and when faced with the

reality of those stories, becomes agitated and storms out of the house."  The record

is replete with medical evidence of Reel's alcohol abuse and alcohol withdrawal

symptoms.  The evidence does not demonstrate that Reel has a physical or mental

impairment, absent his alcohol abuse, that would preclude his ability to perform

simple, light work.

Although Reel argues that the ALJ should have sought an expert medical

opinion on this question, he acknowledges that it is not required.  See Vester v.

Barnhart, 416 F.3d 886, 891 (8th Cir. 2005).[5]   Here, the ALJ relied on medical

records of both treating and consultative examiners, as well as the testimony of

Reel and his wife, to arrive at her conclusion that Reel's alcohol abuse was a

contributing factor material to the determination of his disability.  Because

substantial evidence on the record as a whole supports this conclusion, the ALJ's

decision will be affirmed.

   Reel next argues that the ALJ erred by failing to find that his conditions

meet or equal Listings 11.02 (convulsive epilepsy), 11.03 (nonconvulsive

epilepsy), 12.04 (affective disorder), and 12.08 (personality disorder).  The

severity standards for listed impairments are high "[b]ecause the Listings, if met,

operate to cut off further detailed inquiry . . . ."  Fortner v. Astrue, 2009 WL

166701 *10 (W.D. Mo. Jan. 26, 2009) (citing Caviness v. Astrue, 4 F. Supp. 2d

813, 818 (S.D. Ind. 1998)).  For this reason, "they should not be read

expansively."  Fortner, 2009 WL 166701 at *10.  To meet Listing 11.02, Reel

must demonstrate convulsive epilepsy, documented by a detailed description of a

typical seizure pattern, including all associated phenomena, and occurring more

---

[5]As stated above, although the ALJ remains responsible for developing a full and fair
record, Reel carries the burden of proving that substance abuse was not a contributing factor
material to the claimed disability.  He offered no such medical opinion to the ALJ.

frequently than once a month in spite of at least three months prescribed treatment.

See 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02. Listing 11.03 requires

nonconvulsive epilepsy, documented by a detailed description of a typical seizure

pattern, including all associated phenomena, and occurring more frequently than

once weekly in spite of at least three months of prescribed treatment. See 20

C.F.R. pt. 404, subpt. P, app. 1, § 11.03. According to the statements given by

Reel's wife and cousin in support of his benefits applications, Reel had only three

seizures over 24 months or six over two to three years, which do not meet the

Listing. The evidence also demonstrates that Reel's seizure disorder was

controlled while taking his Dilantin, which he began in July of 2003. There is no

evidence of any seizures not caused by alcohol withdrawal until November of

2003, when Reel was out of Dilantin. In April of 2005, Reel received a 90-day

prescription from Dr. Austin for Dilantin. Reel did not have the prescription

refilled and reported having more seizures only after his medication ran out. Reel

suffered a seizure in July of 2006 when he was out of Dilantin and suffering from

alcohol withdrawal. Although Reel's wife testified that he continued to take

Dilantin, there are no medical records documenting a renewed prescription for

Dilantin after April of 2005. Drs. Whaley and Davidson reviewed Reel's medical

records and determined that Reel's infrequent seizures were generally controlled

and not a severe impairment and thus, could not meet or equal Listings 11.02 or 11.03. When the record is viewed as a whole, the ALJ's determination that Reel could not meet or equal Listing 11.02 and 11.03 is supported by substantial evidence.

Listings 12.04 and 12.08 require at least two of the following: marked limitations in the activities of daily living; social functioning; or concentration, persistence, and pace; or, repeated episodes of decompensation. <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.08. A claimant may meet or equal a listing only if he meets or equals all elements of the listing. <u>See</u> <u>Deckard v. Apfel</u>, 213 F.3d 996, 997 (8th Cir. 2000). Here, there is no evidence in the record to support a finding that Reel suffered from any episodes of decompensation, let alone the requisite "repeated" episodes, nor is there any evidence that Reel had "marked" limitations in activities of daily living, social functioning, or concentration, persistence, and pace. Dr. Donahue reviewed the medical records and determined that Reel had no episodes of decompensation and only "moderate" problems with concentration, persistence, and pace. There are no contrary medical opinions in the record. Because the ALJ's findings are supported by substantial medical and record evidence, her determination that Reel did not meet or equal Listings 12.04 and 12.08 will be affirmed.

Reel next argues that the ALJ's determination of his RFC was not supported by substantial evidence. RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth Circuit has noted the ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Here, the ALJ determined that if Reel stopped drinking, he would have the residual functional capacity to perform light work, except because of his seizures, he could not drive, climb scaffolding, ladders or ropes, and could not work at unprotected heights or around dangerous equipment. She also concluded that he would still be limited to simple, non-complex instructions, in a routine and repetitive job that used little judgment and is learned by rote with few variables. The ALJ also decided that Reel could have only superficial contact with the public and co-workers and would need concrete, direct, and specific supervision. The

ALJ reached this decision after considering the entire record, including the medical evidence and Reel's testimony.

The ALJ properly considered Reel's subjective complaints of pain using the Polaksi factors. In support of her credibility findings, the ALJ noted that Reel's impairments were controlled with treatment, see Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."), and that no physician who examined Reel found him to have limitations consistent with disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work."). The lack of medical evidence supporting Reel's complaints was a proper consideration when evaluating his credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was his failure to pursue more aggressive treatment. See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999). Reel failed to comply with his prescribed treatment, despite his improvements from treatment. Reel did not take medication and therapy as prescribed, left the hospital against medical advice, and refused AA counseling. Reel continued to smoke and drink against medical advice, and his smoking is inconsistent with complaints of COPD. "A failure to follow a recommended

course of treatment also weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (internal citation omitted); see also Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications, seek treatment, and quit smoking") (internal citations omitted).   Although Reel and his wife contended that they were unable to afford his medications, the ALJ found that this assertion was not supported by the record, given the testimony that Reel drank up to a half a gallon of alcohol and smoked a pack of cigarettes per day.  The Eighth Circuit rejected a lack of financial resources as an explanation for the absence of medical treatment of prescription medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication." Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).  There is no evidence in the record to suggest that Reel was ever denied medical treatment due to financial concerns, or that he did not take medication because it caused significant side effects.  See, Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003).   The ALJ also noted other inconsistencies in the record that undermined Reel's credibility, including his

allegation that he was unable to perform any daily activities despite his assertion

to Dr. Hudson that, when sober, he performed all household chores.  In addition,

Reel testified that he quit drinking in December of 2005, but later admitted it was

in 2006.  Reel's wife testified that he quit drinking in July or August of 2006, then

she stated it was about seven or eight months before the hearing.  The ALJ also

considered Reel's demeanor during the hearing, which is "completely proper in

making credibility determinations."  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th

Cir. 2001) (internal citation omitted).  Because the ALJ outlined good reasons for

discounting the credibility of Reel's subjective allegations and relied on

substantial evidence in the record in doing so, I will affirm the ALJ's credibility

determination.  Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007).

The evidence submitted to Appeals Council also supports the ALJ's

findings.  The lack of treatment records from August 2006 to March 2008 supports

the ALJ's decision that Reel's problems were not disabling absent the effects of

alcohol.  Although Reel argues that he has cirrhosis and relies on a notation on Dr.

Berke's record that he "needs liver transplant," there is no medical evidence that

Reel was ever diagnosed with cirrhosis or needs a liver transplant.  The only

reference by a medical doctor to a liver transplant is a single notation by Dr.

Mackercher in 2002 that a liver transplant would be "considered."  Dr. Berke is a

Ph.D., not an M.D., and evaluated Reel once while he was incarcerated for psychiatric evaluation and medications. "It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence within the record." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotation marks and citation omitted). This is especially so where, as here, the opinion is rendered by a physician with no expertise in the condition at issue. See Reed v. Barnhart, 399 F.3d 917, 922 (8th Cir. 2005). Although Reel experienced a possible seizure in March of 2009, there is evidence in the record that Reel continued to drink and that his prescription for Dilantin had run out in July of 2005. Reel also left the hospital against medical advice. When the record is viewed as a whole, the ALJ findings regarding Reel's credibility are supported by substantial evidence.

After engaging in a proper credibility analysis, the ALJ incorporated into Reel's RFC those impairments and restrictions found credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). The vocational expert testified in response to the ALJ's hypothetical question that incorporated the same limitations as Reel's RFC, that such an individual could perform work as a poultry cutter and a

hotel/motel maid.  The question was properly formulated, so the expert's

testimony that Reel could perform other work constitutes substantial evidence

supporting the ALJ's decision that Reel is not disabled.  See Cruze v. Chater, 85

F.3d 1320, 1323 (8th Cir. 1996) ("Testimony from a VE [vocational expert]  based

on a properly phrased hypothetical question constitutes substantial evidence.").  I

find that substantial evidence as a whole supports the ALJ's decision to deny

benefits because Reel is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner

denying benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered

this date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 26th day of January, 2011.